# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Respondent, | ) | Case No. 03 C 1432 |
| v. | ) | |
| | ) | |
| JOSE HERRERA CORRAL, | ) | Judge Joan B. Gottschall |
| | ) | |
| Petitioner. | ) | |

## MEMORANDUM OPINION AND ORDER

Petitioner Jose Herrera Corral moves this court for relief pursuant to 28 U.S.C. § 2255. The court held a hearing in this matter on August 1, 2, 22, 25 and 26, 2005. For the reasons explained below, Herrera Corral's petition is denied.

### Background

Herrera Corral and his father-in-law, Fidel Robles-Ortega, were indicted on May 17, 2001 in the Northern District of Illinois and charged with conspiracy to possess with intent to distribute cocaine and possession with intent to distribute cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and 846 and 18 U.S.C. § 2. Herrera Corral and Robles-Ortega were charged as co-defendants in the same criminal proceeding. Robles-Ortega retained the services of attorney Ralph Meczyk, while petitioner was represented by Lawrence Hyman, an attorney with whom Meczyk shared an office.

A principal issue in the case was the government's seizure of drugs. After holding a suppression hearing, this court on February 20, 2002 held that the government's seizure of drugs was legal. Following this ruling, both Herrera Corral and Robles-Ortega entered into plea agreements with the government. Both reserved the right to appeal the suppression ruling. According to Herrera Corral, Hyman informed him that he would be eligible for the "safety valve" (wherein he

would receive a lesser sentence for giving the government information about the drug conspiracy and transaction) and would have to serve only from five to seven years, instead of the ten-year statutory minimum. While Herrera Corral did meet in May 2002 with Hyman and two Assistant United States Attorneys, he claims that Hyman failed to prepare him for the meeting. Because the government concluded that Herrera Corral was not being truthful and candid during that interview, it did not recommend the safety valve at the sentencing. At the sentencing, Herrera Corral was sentenced to the mandatory minimum ten years in prison and the "safety valve" was denied. According to Hyman, after Herrera Corral was sentenced, he told Herrera Corral that he had ten days to appeal and that it was in his best interest to do so. Hyman claims that Herrera Corral responded that he "did not care about any appeal." Herrera Corral denies making this statement.

Herrera Corral maintains that he wished to appeal, but could not get through to Hyman's office to instruct him to file a notice of appeal. Herrera Corral also indicated that, after realizing his calls were blocked by Hyman, his wife attempted to contact Hyman regarding the appeal. Herrera Corral's wife testified that she tried to call Hyman's office during the ten-day appeal period but never reached Hyman himself until weeks after the sentencing. No notice of appeal was ever filed on Herrera Corral's behalf.

After Robles-Ortega appealed, the Seventh Circuit reversed this court's ruling on suppression.

## Analysis

Under 28 U.S.C. § 2255, federal prisoners can challenge the imposition or length of their detention if their conviction or sentence has been founded on an error that is "jurisdictional, constitutional, or is a fundamental defect which inherently results in a complete miscarriage of

justice." *Oliver v. United States*, 961 F.2d 1339, 1341 (7th Cir. 1995); 28 U.S.C. § 2255. If the court determines that any of these errors infected the judgment or sentence, the petitioner's conviction will be vacated or set aside, and the petitioner will be discharged, resentenced, or granted a new trial. *Id.*

Herrera Corral urges the court to grant his Section 2255 relief based on the following claims of ineffective assistance of counsel: (1) Hyman suffered from a conflict of interest such that he placed the interests of Robles-Ortega above those of Herrera Corral; and (2) Hyman failed to file a notice of appeal regarding the suppression hearing ruling. The court rejects the government's assertion that Herrera Corral's ineffective assistance of counsel claims should be barred because Herrera Corral failed to raise them on direct appeal. They are properly before the court. *Fountain v. United States*, 211 F.3d 429, 433 (7th Cir. 2000) (ineffective assistance of counsel claims properly brought in Section 2255 petition rather than on direct appeal because they often attempt to rely on facts outside the record).

To establish ineffective assistance of counsel, Herrera Corral must demonstrate: (1) that his attorney's performance was deficient; and (2) that such representation prejudiced his case. *Precin v. United States*, 23 F.3d 1215, 1218 (7th Cir. 1994) (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). The first prong is satisfied by showing that counsel's performance fell below the "objective standard of reasonableness" guaranteed under the Sixth Amendment. *Barker v. United States*, 7 F.3d 629, 633 (7th Cir. 1993) (quoting *Strickland*, 466 U.S. at 687). To satisfy the second element, Herrera Corral must show that because of counsel's error, the outcome of his trial or sentencing was fundamentally unreliable or unfair. *Id.*

**Conflict of Interest**

In Herrera Corral's revised petition for habeas relief he argued that his counsel was ineffective because he had a conflict of interest that prejudiced Herrera Corral.[1] While not entirely clear from petitioner's briefs, it appears that Herrera Corral argues that his counsel suffered from a conflict of interest because: (1) Herrera Corral's fee was paid for by his co-defendant father-in-law; and (2) Herrera Corral's attorney, Lawrence Hyman, was associated in practice with Robles-Ortega's attorney, Ralph Meczyk. This conflict of interest, Herrera Corral asserts, prejudiced Herrera Corral when Hyman failed to prepare Herrera Corral for his safety valve proffer and conspired with Ralph Meczyk so that Herrera Corral would not testify against Robles-Ortega.

To prevail, petitioner must prove that (1) his counsel's performance was deficient; and (2) he was prejudiced by the inadequate performance. *Strickland*, 466 U.S. at 687. However, when that claim is based on a conflict of interest, the defendant can satisfy the prejudice element by proving either that his counsel (1) labored under an actual conflict of interest, or (2) was subject to a potential conflict of interest which the court was or should have been aware of, and which it failed to address adequately. *United States v. Pergler*, 233 F.3d 1005, 1009 (7th Cir. 2000). The government asserts without discussion that Herrera Corral must prove an actual conflict because he

---

[1] In passing, Herrera Corral mentions that Hyman's performance with respect to the safety valve meeting was "incompetency." Herrera Corral's revised petition and other briefing argue solely that Hyman was ineffective due to his conflict of interest (which manifested itself at the safety valve meeting). Therefore, Herrera Corral's single sentence outlining a completely new legal argument – that, separate from any conflict of interest, Hyman was deficient at the safety valve meeting – is insufficiently developed to be considered by this court. This argument is therefore waived. *Lac Corte Oreilles Band of Lake Superior Chippewa Indians v. United States Internal Revenue Serv.*, 845 F.2d 139, 141 (7th Cir. 1988) (failure to present argument results in argument being waived).

did not raise the conflict of interest to the court,[2] and Herrera Corral fails to address the proper legal standard for a conflict of interest case at all. The court reads Herrera Corral's briefs as asserting that Hyman suffered from an actual conflict of interest.[3] Herrera Corral must put forward evidence of an actual conflict that "adversely affected" Hyman's performance. An actual conflict of interest exists when "the defense attorney was required to make a choice advancing his own interests to the detriment of his client's interests." *United States v. Horton*, 845 F.2d 1414, 1419 (7th Cir. 1988) (citations omitted).

Neither party in this case meaningfully discusses the first element of *Strickland* – that is, whether or not Hyman's behavior was deficient. Petitioner purports to discuss it, but then jumps into a discussion of the conflict of interest itself. Because it does not find prejudice here, the court will assume Hyman's behavior was deficient and proceed directly to the prejudice prong. For the reasons explained below, the court finds that there was no actual conflict of interest in this case. Petitioner has failed to satisfy the prejudice prong of *Strickland* and his conflict of interest claim fails.

---

[2]While Herrera Corral notified the court that he was not getting along with Hyman, the court was not informed that Herrera Corral believed that Hyman was acting under a conflict of interest because of the fee arrangement and the working relationship between Hyman and Meczyk, and that Hyman was actively representing the interests of Robles-Ortega to the detriment of Herrera Corral.

[3] The court notes that Herrera Corral uses the phrase "potential conflict of interest" twice in his post-hearing briefs (and not at all in his revised petition for habeas corpus). These two passing references to a potential conflict of interest are insufficient to properly present the argument to the court and that argument is therefore waived. *Lac Corte Oreilles Band of Lake Superior Chippewa Indians v. United States Internal Revenue Serv.*, 845 F.2d 139, 141 (7th Cir. 1988). It is not the court's job to speculate about what argument petitioner is attempting to make, and make it for him. In any event, Herrera Corral failed to argue that any potential conflict of interest was raised before the court and inadequately remedied. Therefore, Herrera Corral's only option is to attempt to show an actual conflict of interest.

Even assuming the fee payment and the Hyman/Meczyk relationship could constitute a conflict of interest,[4] the facts of this case show that there was no actual conflict. Until February 2002 when the court issued its denial of the motion to suppress, the interests of Herrera Corral and Robles-Ortega were aligned and no actual conflict could have existed. The main thrust of Herrera Corral's argument is that the alleged conflict of interest caused Hyman to protect Robles-Ortega's interests to the detriment of Herrera Corral at the safety valve meeting. Herrera Corral argues that Hyman failed to prepare him properly for the safety valve meeting and failed to cure any deficiencies that resulted from it because Hyman was instead protecting Robles-Ortega. As an initial matter, the court notes that by the time Herrera Corral had his safety valve meeting on May 20, 2002, Robles-Ortega had already pled guilty. Therefore, it seems extremely unlikely that Robles-

---

[4]While the court assumes for purposes of this petition that the fee arrangement and the Hyman/Meczyk relationship could lay the groundwork for a conflict of interest, it is doubtful that either basis was actually established here. With respect to payment of the fee, the evidence showed that Herrera Corral's fee was paid for, in part, by his wife and also by Adella Sanchez, the girlfriend of Robles-Ortega. Herrera Corral and his wife asserted that Adella Sanchez paid the fee on behalf of Robles-Ortega but the court is uncomfortable making that assumption absent some other evidence supporting that connection. Even if Robles-Ortega paid the remaining balance of Herrera Corral's fee, Herrera Corral testified that he understood that part of his fee was being paid by his father-in-law and, in fact, agreed to this arrangement. "In accepting payment of fees by one person for the defense of another, a lawyer should be careful to determine that he or she will not be confronted with a conflict of loyalty since the lawyer's entire loyalty is due the accused. It is unprofessional conduct for the lawyer to accept such compensation *except with the consent of the accused* after full disclosure." *See ABA Standards for Criminal Justice (Second Edition) 1986 Supplement* (emphasis added).

In addition, Herrera Corral's assertion that Hyman and Meczyk were "associated in practice" was not borne out by the evidence at the hearing. The evidence showed that, as many solo practitioners do, Hyman and Meczyk shared the costs of an office, such as rent and a secretary. Hyman testified that he and Meczyk were not in business together, but rather each had a separate business with separate clients. The fact that they divided any fees coming in on this case does not convince the court that their respective businesses were so comingled as to constitute a joint practice.

Ortega would have gained anything from Herrera Corral's failed safety valve meeting. At that time, there no longer was the possibility that Herrera Corral could testify at Robles-Ortega's trial.

More importantly, and fatal to his claim, Herrera Corral has not explained how he was prejudiced by Hyman's supposedly conflicted behavior at the safety valve meeting. Herrera Corral has consistently maintained that he did not lie at the safety valve meeting and, in fact, told the government all that he knew about the drug transaction at issue. At the sentencing, when discussing the apparent problems with Herrera Corral's safety valve interview, Hyman told the court, "[Herrera Corral]'s still going to maintain, as I understand my conversations with him, exactly what he told the government at the debriefing." (11/8/02 Tr. 8.) Further, Hyman stated, "[Herrera Corral] continues to claim that this information that he responded to and he gave was what he knew." (11/8/02 Tr. 16.) And later, Hyman explained to the court, "Mr. Herrera, Judge, has always at least maintained to me that whatever he has told the government at that meeting in April or May, I think it was May, up in Dodge County was what he knew." (11/8/02 Tr. 28.) When given a chance to speak at the sentencing, Herrera Corral stated, "Everything I've said is the truth. It's all I know." (11/8/02 Tr. 30.) Similarly, at the evidentiary hearing, Herrera Corral testified that he told the government everything he knew. (8/1/05 Tr. 25) ("Q: So in this safety valve meeting, did you tell the Government everything you know? A: Yes, I told them[.]"); (8/1/05 Tr. 26) ("Q: Okay. So you thought at that point in time you qualified for the safety valve? A: I always thought so because I have nothing to hide. I've always been open.").

In light of this, the court has no evidence before it that the outcome of the safety valve meeting would have been any different had Hyman not suffered from any alleged conflict of interest. Herrera Corral has always maintained that he told the government all he knew, and he has never

explained what additional information, if any, he has that he could have provided the government had he been properly prepared by counsel. Accordingly, he has not shown prejudice and his claim cannot survive.

In addition to the safety valve issue, Herrera Corral argues, rather contradictorily, that Hyman never discussed cooperation with him and that Hyman discouraged him from cooperating with the government against Robles-Ortega because of Hyman's alleged conflict of interest. Having reviewed the evidence, the court concludes that Herrera Corral has failed to put forward sufficient evidence to be persuasive on this point. The only support Herrera Corral points to is his own assertion that Hyman never discussed cooperation with him. In stark contrast to Herrera Corral's categorical denial that Hyman ever discussed cooperation, Hyman testified that he discussed the possibility of testifying against Robles-Ortega with Herrera Corral on a few occasions after the suppression ruling. Hyman's version of events is supported by a portion of the record in this case. At the change of plea hearing on March 5, 2002, Hyman explained in Herrera Corral's presence: "Because he was also in a position to potentially testify for the government against his codefendant in this case. If he did, his interest was what additional time below this Guideline range could he get. And all we could do is tell him what the potentials were if he cooperated." Hyman's statement at the change of plea hearing indicates that he had discussed cooperation with Herrera Corral and that Herrera Corral asked how his sentence would be reduced if he did cooperate. In light of this, the court is not willing to accept Herrera Corral's assertion that Hyman never discussed the possibility of cooperation.

Finally, the court must comment on a meeting that Herrera Corral describes as occurring at an unknown time between him, Hyman and Meczyk. Herrera Corral's testimony concerning this

meeting was so hard to follow that the court, even after reviewing the transcript, cannot give it any weight. Herrera Corral attempts to use it as proof that Hyman and Meczyk conspired to keep him from testifying against Robles-Ortega. Even if the court were to believe Herrera Corral that the meeting occurred (Hyman maintained no such meeting ever took place), Herrera Corral could provide no context for the meeting except to say that it occurred some time before the plea agreement. According to Herrera Corral, the meeting focused on whether or not he would testify. Herrera Corral testified that Hyman told him, "No, no, no, that's not going to happen because it could come off badly." The court has no idea if this refers to whether Herrera Corral would testify at the suppression hearing, at Herrera Corral's own trial or at a trial for Robles-Ortega. The court finds Herrera Corral's account of this meeting to be incoherent, and for this reason, concludes that Herrera Corral failed to put forward convincing evidence that Hyman and Meczyk engaged in any kind of conspiracy.

For all these reasons, Herrera Corral's ineffective assistance of counsel claim based on Hyman's alleged conflict of interest is denied.

**Failure to File Notice of Appeal**

The government argues that Hyman was not deficient in failing to file a notice of appeal because Herrera Corral told Hyman not to file an appeal. At the evidentiary hearing in this case, Hyman testified that just after the sentencing, he and his interpreter walked with Herrera Corral to the lockup in the courtroom. Hyman testified that he did not file a notice of appeal because, after he advised Herrera Corral of his right to appeal, Herrera Corral told him that "he didn't want me to file an appeal." (8/1/05 Tr. 73.) Hyman also testified that he told Herrera Corral, "Listen, you have a chance. I thought there was a meritorious issue on appeal, that he should follow through and

should take the appeal. . ." (8/1/05 Tr. 75.) Hyman also stated that, "I remember [Herrera Corral] just sat on the bench back in the lockup, and he just said: I don't care. I don't care." (8/1/05 Tr. 75). Hyman testified that after he left the courtroom he spoke with Herrera Corral's wife and advised her that her husband should file a notice of appeal within the ten-day period. (8/1/05 Tr. 76.) In addition to Hyman's testimony, Frederico Rodriguez, who acted as an interpreter for Hyman, also testified that he recalled that after Herrera Corral was advised of his appellate rights by Hyman, Herrera Corral said ". . . no, that's okay." (8/2/05 Tr. 167.) Rodriguez explained that he and Hyman "more than twice" told Herrera Corral that he should pursue his appeal and that Herrera Corral said "no" or that he "didn't care." (8/2/05 Tr. 168, 169.) Rodriguez was not sure if the exchange with Herrera Corral occurred just before or after the sentencing, although he testified that he and Hyman likely would have met with Herrera Corral both before and after the sentencing.

Herrera Corral testified that he never told Hyman that he was not interested in filing an appeal. He testified that while he met with Hyman prior to the sentencing regarding his appeal, he did not talk to Hyman after he was sentenced. In addition, Herrera Corral's wife and sister testified that they did not see Hyman walk over to the lock-up after the sentencing. Herrera Corral further testified that he recalled that the court informed him at sentencing that he had ten days to file a notice of appeal. He explained that Hyman had placed a block on calls from Herrera Corral and that he was unable to contact Hyman over the telephone. Herrera Corral testified that three days after the sentencing he called his wife and asked her to call Hyman to inform him that Herrera Corral wished to file an appeal. Herrera Corral's wife testified that she called Hyman multiple times after sentencing but that he did not return her calls until approximately three weeks after the sentencing.

In *Roe v. Flores-Ortega*, 528 U.S. 470 (2000), the United States Supreme Court held that

10

where a defendant tells his attorney not to file an appeal, the defendant "cannot later complain that, by following these instructions, his counsel performed deficiently." *Id.* After reviewing the evidence and briefing in this case, the court concludes that Hyman was not deficient in not filing a notice of appeal.

The evidence at the hearing produced two distinct stories regarding what happened after Herrera Corral was sentenced. According to Hyman (and supported by Rodriguez), after Hyman advised Herrera Corral that he should file a notice of appeal and that he had ten days to do so, Herrera Corral told Hyman and Rodriguez that he did not want to appeal. Herrera Corral, however, denies that this exchange ever took place and complains that Hyman basically made himself unavailable to both Herrera Corral and his wife in the days and weeks following the sentencing.

Having listened to the testimony and viewed the demeanor of the witnesses, the court finds Hyman and Rodriguez to be the more credible witnesses in this case. Importantly, with respect to the crucial conversation between Hyman and Herrera Corral, Hyman's version of events is supported by Rodriguez. Hyman presented a clear and coherent account of what occurred on the day of the sentencing. Hyman and Rodriguez described Herrera Corral as upset during the conversation about the appeal, which comports with Herrera Corral's assertion that he was shocked after the safety valve was denied and he was sentenced to a ten-year sentence. Rodriguez testified that this conversation stood out in his mind because he and Hyman had worked so hard on the suppression hearing and preserving the issue for appeal that they were adamant that Herrera Corral should appeal. Rodriguez testified that he explained to Herrera Corral: "Listen, if you win [the appeal], you're out. You're out. Forget the sentence. You're out." At the hearing, Herrera Corral admitted that Hyman advised him that his chances on appeal were good (although Herrera Corral

asserts that this conversation occurred just before the sentencing). It makes sense that Herrera Corral would have responded in some way to Hyman and Rodriguez when they brought up his chances on appeal.

On the other hand, Herrera Corral's demeanor on the stand did not engender much confidence in his version of events. His testimony was incoherent, evasive and inconsistent at times. In addition to Herrera Corral's demeanor on the stand, he admitted to lying to the court in his sworn affidavit when he averred that he attempted to call Hyman after the sentencing. Also, when he was questioned about his assertion that Hyman told him to lie to the court, Herrera Corral was evasive and clearly uncomfortable on the stand. In the end, he could not tell the court why he made this statement in his original petition. Further Herrera Corral testified inconsistently on the stand, stating that Hyman never informed him of his appellate rights (and that he had no issues to appeal) while he testified earlier that Hyman had told him his chances on appeal were "good." While the court found Herrera Corral's wife and sister to be somewhat credible, any weight accorded to them does not tip the balance in Herrera Corral's favor in light of the strength of Hyman and Rodriguez's testimony.[5]

Given the animosity between Hyman and Herrera Corral in the underlying case, it seems likely, and indeed reasonable, that Hyman detached himself from Herrera Corral's case as soon as his client informed him that he did not intend on pursuing an appeal. Hyman manifestly did not engage in a much of a discussion with Herrera Corral regarding his appeal – Hyman admitted that

---

[5] Herrera Corral argues that even if he told Hyman that he was not interested in an appeal, Hyman was deficient because Herrera Corral could not contact Hyman within the ten day period, assuming Herrera Corral changed his mind regarding appeal. Herrera Corral provides no support for the argument (and the court cannot find any) that an attorney has a duty to be reachable by his client after his client has discharged him.

the exchange took place over the course of a couple of minutes at a stressful time. Nevertheless, the court finds that Herrera Corral was advised of his right to appeal and indicated clearly, albeit under circumstances when he was dejected and upset, that he did not care about, and was not interested in, appealing. Because of this, Herrera Corral's ineffective assistance of counsel claim based on the notice of appeal fails.

## CONCLUSION

Herrera Corral's request for § 2255 relief is denied.

ENTER:


_____/s/_____
JOAN B. GOTTSCHALL
United States District Judge

DATED:   February 10, 2006